**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3244-23

ESTATE OF JEAN M. EARLY
by Executor DOREEN
MCCULLOUGH, and DOREEN
MCCULLOUGH, individually,

     Plaintiffs-Appellants,

v.

ENGLEWOOD HOSPITAL AND
MEDICAL CENTER, and
CARE ONE AT TEANECK, LLC,
d/b/a CAREONE AT TEANECK,[1]

     Defendants-Respondents.

_____

     Argued December 18, 2025 – Decided August 14, 2026

     Before Judges Marczyk, Bishop-Thompson and Puglisi.

     On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-3923-19.

     Sherri L. Warfel argued the cause for appellants (Pellettieri Rabstein & Altman, attorneys; Sherri L.

---

[1] Improperly pled as Care One at Teaneck.

Warfel, of counsel and on the briefs; Sherrill Menyhert and Steven J. Rogers, Jr., on the briefs).

John R. Scott argued the cause for respondent Englewood Hospital and Medical Center (Clare & Scott, LLC, attorneys; John R. Scott, of counsel and on the brief).

Anthony Cocca argued the cause for respondent CareOne at Teaneck (Cocca & Cutinello, LLP, attorneys; Anthony Cocca and Katelyn E. Cutinello, of counsel and on the brief).

PER CURIAM

In this medical negligence action, plaintiffs the Estate of Jean M. Early, by Executor Doreen McCullough, and Doreen McCullough, individually, appeal from the trial court's June 18, 2024 judgment in favor of defendants Englewood Hospital and Medical Center (Englewood) and CareOne at Teaneck (CareOne). Following our review of the record and applicable legal principles, we affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

I.

On December 11, 2017, Jean M. Early (decedent) was admitted to Englewood after being sent from her primary care doctor's office with a diagnosis of new onset atrial fibrillation and flu-like symptoms. According to Englewood's assessment upon her admission, decedent's skin was intact, and she

was not at risk for development of pressure-related injuries; however, a later assessment showed her risk had increased three or four days after her admission. She was placed on a pressure-redistribution mattress, but plaintiffs assert she was not consistently turned and repositioned every two hours. Decedent's blood cultures revealed a severe infection in her bloodstream from December 12 through December 21.

Decedent developed erythema, or skin redness, on her sacrum by December 20, 2017. A wound care specialist, who identified "an irregular shape[d] deep tissue injury" to her right and left buttocks and sacrum, was consulted on December 23. A low air loss mattress and nutrition consultation were ordered. On December 28, decedent's sacral wound was noted to be six by fifteen centimeters. By January 3, 2018, the wound was "unstageable" and covered with necrotic tissue.

Decedent was stable and discharged from Englewood on January 17, 2018, and she was transferred to CareOne. Upon admission to CareOne, decedent's sacral wound was characterized as "unstageable" and measured sixteen by eight centimeters with slough. On January 23, a podiatrist who was consulted for lesions on the bottom of decedent's feet, noted her left foot ulcer had undergone debridement. By February 12, the sacral wound was decreasing

3

in size, and new skin was forming, and by February 21, decedent's kidney function had improved enough to remove her dialysis catheter. Later that month, the sacral wound was debrided and documented as stage four with tunneling.

Decedent was transferred to Prospect Heights Care Center on March 14, 2018. There, she was found to have a stage four pressure injury, measuring ten by seven by three centimeters with tunnelling. On March 16, she was transferred back to Englewood due to the infected pressure injuries and deep vein thrombosis. Decedent was subsequently discharged home on hospice and passed away on April 9, 2018. The cause of death listed on her death certificate was sepsis, with an onset three weeks prior.

In May 2019, plaintiffs filed a complaint alleging defendants were negligent in their care and treatment of decedent regarding the development of her pressure ulcers and sepsis, which resulted in pain, suffering, disability, loss of quality of life, and, ultimately, her wrongful death. They further alleged violations of the New Jersey Nursing Home Responsibilities and Rights of Residents Act (NHA), N.J.S.A. 30:13-1 to -19, and federal statutes. After defendants answered, the parties engaged in discovery.

The court denied Englewood's summary judgment motion as to plaintiffs' wrongful death claims on February 17, 2023, but it dismissed with prejudice all

4

statutory claims as they pertained to Englewood, including the NHA claims, which were dismissed by plaintiffs' consent. The court further granted, in part, CareOne's motion for summary judgment, dismissing plaintiffs' statutory claims, including those under the NHA, and the count alleging noncompliance with federal regulations regarding pressure wounds. However, CareOne's motion for summary judgment seeking dismissal of the entire complaint was denied. The punitive damage claims were dismissed against both defendants. The court's orders allowed plaintiffs to "offer alleged statutory violations as evidence of negligence in support of their remaining claims" as to both defendants, and regulatory violations as to CareOne.

In May 2024, CareOne moved in limine to bar testimony from plaintiffs' experts regarding alleged deviations from statutes and regulations related to the claims previously dismissed with prejudice, where those claims were unsupported by a causation opinion. It also moved in limine to preclude plaintiffs from recovering wrongful death and survival act damages. Plaintiffs opposed the motions. The court treated plaintiffs' opposition to CareOne's motion, regarding state and federal regulations serving as evidence of negligence, as a motion for reconsideration of its February 17, 2023 order dismissing plaintiffs' NHA claims, and it denied the application.

A-3244-23

A ten-day trial commenced in June 2024. Charlotte Sheppard, R.N., testified on plaintiffs' behalf as an expert in nursing and wound care.[2] She opined a patient at risk for skin breakdown requires offloading, which she described as turning and repositioning the patient every two hours, and the use of support surfaces which can help redistribute pressure. Nurse Sheppard testified CareOne had "standard of care departures" because it "failed to appropriately conduct assessments of [decedent's] skin and provide adequate offloading." Additionally, she explained decedent's care plan initially contained only one intervention—"[a]dminister treatment per physician orders"—when CareOne should have also developed a turning schedule and a plan to measure the wound, identify signs of deterioration, and provide other interventions, including a specialty mattress. Nurse Sheppard did not opine on the cause of decedent's death or the cause of any infection decedent developed.

---

[2] Nurse Sheppard opined in her expert report Englewood's "nursing and support staff failed to meet the standard of care in their care and treatment" of decedent, and CareOne "likewise failed to appropriately respond to [decedent]'s individualized needs[,] including her obvious risk for skin deterioration." She cited several statutes and regulations in her report she believed CareOne violated and noted those statutes and regulations "were relied upon, in part, in the rendering of [her] opinions."

A-3244-23

Lloyd Krieger, M.D., also testified on behalf of plaintiffs regarding the causes and progression of decedent's pressure sores. Dr. Krieger was qualified as an expert in medicine and wound care, and his de bene esse testimony was played for the jury. He opined decedent suffered as a result of nursing malpractice at defendants' facilities because she developed

> [n]ew onset pressure injuries, which led to [large,] full[-]fledged pressure sores . . . .
>
> And [they] w[ere] also deep down to [the] bone, which is the staging, which was, in [decedent's] case, [s]tage [four]. These wounds were allowed to occur. They were allowed to worsen, and they never got significantly better and remained infected certainly until the end of her hospitalization and almost certainly until the time that she died.

However, certain portions of Dr. Krieger's testimony were excluded from the video played for the jury. Prior to playing Dr. Krieger's testimony, the court granted defendants' motion to strike his testimony regarding decedent's cause of death as an impermissible net opinion. The omitted testimony included Dr. Krieger's statements decedent "died of sepsis, according to the death certificate," and "[a]ccording to the medical records, they indicated multiple areas of her body were affected[,] what we [will] call multisystem organ failure, and those were the causes of her demise," but he had no opinion regarding the cause of the sepsis. The stricken testimony also included his conclusion decedent's infected

7

wound "certainly seeded the blood" and "diminished her capacity to fight infection or sepsis." The court reasoned Dr. Krieger admitted he had no opinion on the cause of decedent's sepsis and failed to relate the sepsis to decedent's pressure injury or death.

After Dr. Krieger's testimony was played for the jury, defendants moved for a directed verdict on plaintiffs' wrongful death claim. The court granted the motion based on its earlier ruling regarding defendants' net opinion motion, again reasoning Dr. Krieger "did not link or provide an opinion on the cause of [decedent]'s sepsis. There was no explanation about sepsis being the cause of death, and he admitted he had no opinion on the cause of sepsis."

Cosie Adjei-Frimung, a certified nursing assistant, testified she was employed by Holistic HomeCare Associates and cared for decedent when she returned home shortly before her death. During the time she provided hospice care for decedent, she took "numerous" photographs of decedent's pressure wound. She testified on direct examination she could not identify exactly which photograph she was presented with at trial, explaining she took a photograph every time she changed decedent's wound dressing. Adjei-Frimung explained she would send the pictures to the wound nurse via text message. When asked if she could recall what the wound looked like, she recalled "[i]t was quite deep."

A caption above the photograph read:  "Photo taken by [decedent]'s [n]urse's [a]ide."  The court later struck the photograph from the record and instructed the jury to disregard it, after further examination revealed Adjei-Frimung was unable to definitively state she took the photograph.

Brett Gilbert, D.O., testified for Englewood as an expert in infectious disease and internal medicine.  He recounted that from December 12 through 21, 2017, decedent had "positive blood cultures," indicating "a very severe infection," which led to sepsis.  Dr. Gilbert explained, "when someone has sepsis, with an infection such as [decedent's], the body naturally will divert blood flow from certain areas of the body to other areas of the body to preserve the major organs."  He opined decedent's sepsis was "a direct result of the skin infection" and caused "multi system organ failure," including worsening kidney function.  He also opined the lack of blood flow to decedent's skin caused the deep tissue injury, "and it just happened to be in an area where there's pressure."  Dr. Gilbert concluded, "no matter what was done for [decedent], this ischemic event caused th[e] injury[,] and it would have occurred regardless."

Dr. Gilbert disagreed with the death certificate that the cause of death was sepsis "because based on the factual record of the hospital, . . . the vital signs, [and] the physical examinations[,] . . . she did not have sepsis on her second

admission to Englewood." He opined decedent "ended up dying with an infected wound but not because of one," and the wound "developed because of [the] sepsis."

Julie Hester, a licensed nursing home administrator, was called by CareOne. She was qualified as an expert in nursing and wound care. She opined CareOne's nursing staff met the standard of care related to decedent's wound care and general care. Nurse Hester testified decedent's "wound got better over time, it improved every week . . . [decedent] was seen at Care[]One," and a nursing assessment was done when decedent was admitted to CareOne. She also noted CareOne's nurses complied with the regulations requiring a care plan to be completed for a resident upon admission.

Marcia Barnes, who holds a doctoral degree in nursing practice, was called by Englewood. She was qualified as an expert in: nursing and the standard of care for nursing; the assessment, management, and treatment of wounds and pressure injuries; and the origin of pressure injuries. Dr. Barnes testified atrial fibrillation "impacted [decedent's] cardiac output so it compromised perfusion and oxygenation." She stated decedent's sacral pressure wound was unavoidable and developed despite the nursing staff taking all the appropriate steps and implementing the proper interventions. Dr. Barnes explained pre-existing

10

conditions may put a resident at risk of developing a pressure wound, but they are not necessarily the cause of a pressure wound.

Bruce Silver, M.D., was called by CareOne as an expert in internal medicine, wound care, and geriatric medicine. He opined the progression of decedent's wound was "unavoidable." Dr. Silver stated decedent's wound improved at CareOne "because of the treatments that were rendered by [its] nursing . . . staff" and the antibiotics she had received at Englewood for her staph infection. He noted two months was not enough time to fully heal the wound, because decedent's pre-existing conditions—such as her immobility, diabetes, age, kidney disease, and vascular disease—impeded her healing.

The jury found, by a seven-to-one vote, Englewood did not deviate from accepted standards of care in treating decedent. It unanimously determined CareOne did not deviate from accepted standards of care in treating decedent. The jury also found decedent's injuries were wholly caused by her pre-existing conditions. On June 18, 2024, the court entered an order of judgment dismissing all claims against defendants. This appeal ensued.

## II.

### A.

Plaintiffs argue the court erred in dismissing their claims and precluding

11

testimony regarding the NHA and federal statutes. They assert CareOne is a licensed long-term care facility, "otherwise known as a nursing home," and it did not matter decedent was admitted to a "subacute rehabilitation unit" within the facility for short-term care. Plaintiffs challenge CareOne's assertion it is not a "nursing home" under the NHA. They rely on a Department of Health (DOH) memo clarifying long-term care facilities, such as CareOne, are nursing homes, and all individuals residing there—regardless of the particular unit, length of stay, or receipt of subacute care—are residents and protected under N.J.A.C. 8:39. Plaintiffs contend the NHA is to be interpreted liberally because the statute's intent is remedial. Because the Legislature did not expressly exclude subacute rehab or short-term residents from the NHA's protections, plaintiffs maintain the NHA should be interpreted as protecting the individuals treated in those units, and if the Legislature had intended to limit the Act's protections to such units, it would have expressly done so.

Plaintiffs further assert the use of the word "convalesce" in the NHA's definition of "nursing home" implies the Legislature intended to provide protections for patients who intended to receive care and treatment at a nursing home and then return to their own residence. Based on the care and treatment CareOne provides, and its license as a long-term care facility, plaintiffs argue it

12

is clear CareOne qualifies as a nursing home under the NHA. They maintain courts should look to DOH regulations to inform their decisions on what a nursing home is, noting the DOH issues licenses and oversees all healthcare facilities in New Jersey, including nursing homes. Under these regulations, plaintiffs posit CareOne was not legally permitted to operate a subacute rehab unit when decedent was a resident.

As noted, on February 17, 2023, the court[3] dismissed the NHA claims against CareOne but allowed plaintiffs to "offer alleged statutory and regulatory violations as evidence of negligence in support of their remaining claims." During trial, the court considered plaintiffs' opposition to CareOne's motion in limine to bar plaintiffs' experts from testifying regarding alleged violations of federal and state statutes. The court treated the opposition as a motion for reconsideration of its February 17, 2023 order, which it stated was "comprehensive and not forsaking other plaintiffs' rights with respect to presenting the case."

An interlocutory order "shall be subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of

---

[3] A different judge issued the February 17, 2023 order dismissing the NHA claims than the judge who denied the motion for reconsideration.

13

justice." R. 4:42-2(b); Lawson v. Dewar, 468 N.J. Super. 128, 134 (App. Div. 2021); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:42-2 (2026) ("[A]n order adjudicating less than all the claims is subject to revision in the interests of justice at any time before the entry of final judgment."). "Until entry of final judgment, only 'sound discretion' and the 'interest of justice' guides the trial court." Lawson, 468 N.J. Super. at 134 (quoting R. 4:42-2). "Reconsideration under this rule offers a 'far more liberal approach' than Rule 4:49-2, governing reconsideration of a final order." JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 160 (App. Div. 2022) (quoting Lawson, 468 N.J. Super. at 134). A trial court's decision on a motion for reconsideration "will be left undisturbed unless it represents a clear abuse of discretion." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015). However, its "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Id. at 383 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

This court reviews matters of statutory interpretation de novo. Grillo v. State, 469 N.J. Super. 267, 274 (App. Div. 2021). The overriding goal for the court is "to determine as best [it] can the intent of the Legislature, and to give

14

effect to that intent." State v. Robinson, 217 N.J. 594, 604 (2014) (quoting State v. Hudson, 209 N.J. 513, 529 (2012)). "To ascertain legislative intent, we begin with the statute's plain language and give terms their ordinary meaning." State v. S.B., 230 N.J. 62, 68 (2017). We may also "draw inferences based on the statute's overall structure and composition" to "construe the meaning of the Legislature's selected words." Ibid. If the statute's language is clear on its face, the "interpretive process is over." State v. Hupka, 203 N.J. 222, 232 (2010). If it is ambiguous, the court may consider extrinsic interpretative aids like legislative history. Ibid.

"The NHA was enacted in 1976 to declare 'a bill of rights' for nursing home residents and define the 'responsibilities' of nursing homes." Ptaszynski v. Atl. Health Sys., 440 N.J. Super. 24, 32 (App. Div. 2015) (quoting L. 1976, c. 120, § 1 (codified at N.J.S.A. 30:13-1)). The Health and Welfare Committee of the Senate described the law's purpose:

> Residents of nursing homes are all too often given inferior treatment because they are old, feeble[,] or poor. They are in need of a bill of r[ig]hts similar to the bill recently passed by the Legislature and signed into law, enumerating certain rights of the mentally ill.
>
> This bill not only declares that nursing home residents have certain rights; it also lists a number of responsibilities that nursing homes have with regard to the care of residents.

The [f]ederal government has established clear standards of care for residents of skilled and intermediate care nursing facilities who are Medicaid and Medicare recipients. However, this bill makes similar standards of care applicable to all nursing homes and nursing home residents in the State and, moreover, makes such standards an expression of legislative policy and intent.

[S. Insts., Health & Welfare Comm. Statement to S. 944, at 1 (June 4, 1976) (Emphasis omitted).]

The NHA defines a "nursing home" as:

any institution, whether operated for profit or not, which maintains and operates facilities for extended medical and nursing treatment or care for two or more nonrelated individuals with acute or chronic illness or injury, or a physical disability, or who are convalescing, or who are in need of assistance in bathing, dressing, or some other type of supervision, and are in need of such treatment or care on a continuing basis.

[N.J.S.A. 30:13-2(c).]

We determine, as set forth more fully below, the CareOne facility that rendered treatment to decedent in this matter satisfies this definition.

In a hearing discussing the NHA, the then Commissioner of Health testified, "institutionalized long-term care is provided in [New Jersey] in a variety of health facilities, not just nursing homes. There are long-term care units in special hospitals, general hospitals, intermediate care facilities, homes

16

for the aged[,] and a number of different names." Bermudez v. Kessler Inst. for Rehab., 439 N.J. Super. 45, 54 (App. Div. 2015) (alteration in original) (quoting Pers. Care Facilities for the Elderly in N.J.: Hearings Before the Nursing Home Study Comm'n, 4-5 (Apr. 16, 1975) (statement of Joanne Finley, M.D., Comm'r, Dep't of Health)). She also noted "nursing homes in the generic sense" only included intermediate care facilities, skilled nursing facilities, and homes for the aged. Id. at 54 (quoting Hearings Before the Nursing Home Study Comm'n, at 5).

In Bermudez, this court discussed the definition of a nursing home and stated, "although the Legislature wrote a broad definition of 'nursing home,' it nevertheless intended to limit the statute's reach to nursing homes and similar facilities." Id. at 55-56. We held a facility licensed as a "comprehensive rehabilitation hospital" is not a "nursing home" under the NHA. Ibid. We reasoned that just five years before enacting the NHA, the Legislature used the broader term of "health care facility" that included general hospitals, special hospitals, rehabilitation centers, extended care facilities, skilled nursing homes, nursing homes, and intermediate care facilities. Id. at 53. We observed the difference between hospitals and nursing homes:

> Finally, nursing homes generally are not faced with the need to make decisions about a patient's

17

medical care with the same speed that is necessary in hospitals. Hospitals are called upon for urgent care, and treatment decisions in that context must be made quickly. Nursing homes, in contrast, care for individuals whose lives are slowly declining and for whom treatment issues arise more gradually and are foreseeable longer in advance.

[Id. at 52-53 (quoting In re Conroy, 98 N.J. 321, 377 (1985)).]

The DOH provides licenses to medical facilities, whether as: an assisted living residence that provides "apartment-style housing and congregate dining," N.J.S.A. 26:2H-7.15; dementia care homes that provide services to "residents with special needs, including, but not limited to, persons with Alzheimer's disease and related disorders or other forms of dementia," N.J.S.A. 26:2H-148; and hospice care programs, N.J.S.A. 26:2H-80. Notably, there is no license for a "nursing home." Instead, the DOH issues licenses to "long-term care facilities, commonly known as nursing homes." See N.J.A.C. 8:39-1.1. Each licensed long-term care facility must ensure the rights of its residents are protected, including the right to "live in safe, decent, and clean conditions." N.J.A.C. 8:39-4.1.

The NHA defines a "resident" of a nursing home as "any individual receiving extended medical or nursing treatment or care at a nursing home." N.J.S.A. 30:13-2(e). All residents of a nursing home are entitled to certain rights

18                                                        A-3244-23

enumerated in the NHA, such as "the right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the right to . . . appropriate . . . treatment of pain . . . consistent with sound nursing and medical practices." N.J.S.A. 30:13-5(j). Any resident whose rights are violated under the NHA "shall have a cause of action against any person committing such violation." N.J.S.A. 30:13-8(a).

The DOH recently offered clarification "for an interpretation of the rules governing long-term care facilities, commonly known as nursing homes" under N.J.A.C. 8:39-1.1 to -47.5, stating the definition of a "resident" is not limited to "the type or duration of care an individual receives in a long-term care facility." Letter from Michael J. Kennedy, Exec. Dir., Certificate of Need and Licensing Program, to All Licensed Long-Term Care Facilities Pursuant to N.J.A.C. 8:39 (Apr. 18, 2024). The term "resident," according to the DOH, applies to "every individual who resides in the long-term care facility, including, but not limited to, individuals in the facility receiving subacute care and long-term care." Ibid. CareOne was licensed as a long-term care facility in 2018.

When decedent was admitted to CareOne, she required maximum assistance with daily living activities, including incontinence support and bed

19

mobility. She resided at CareOne from January 17 to March 14, 2018—nearly two months. CareOne argued decedent was "supposed to be rehabilitated, try to get back on her feet, and then get out."

Although the definition of "nursing home" in N.J.S.A. 30:13-2(c) does not reference the type of license issued to a facility, the license may be taken into account when considering whether a facility meets that definition. See Ptaszynski, 440 N.J. Super. at 43 (considering the defendant's licenses as a "comprehensive rehabilitation hospital" and a "hospital-based, long-term care facility" when finding it was unclear whether it was a nursing home under the NHA); Bermudez, 439 N.J. Super. at 51 (considering the defendant's license as a "rehabilitation hospital" defined under N.J.A.C. 8:33-1.3 when finding it was not a nursing home under the NHA).

The DOH, under the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26, is charged with "central responsibility for the development and administration of the State's policy with respect to" health care institutions. N.J.S.A. 26:2H-1. It states in its regulations on the licensure of "long-term care facilities" that such facilities are "commonly known as nursing homes." N.J.A.C. 8:39-1.1. As noted, the DOH issued guidance in April 2024 that any person residing at a long-term care facility is considered a "resident" of that

20

facility regardless of the type or duration of care that person receives, including those receiving "subacute" care, as CareOne claims decedent received at its facility. See Letter from Michael J. Kennedy to All Licensed Long-Term Care Facilities.

We also observe N.J.A.C. 8:33H-1.1(g) restricts the use of "long-term care beds" in long-term care facilities to "residents who require general nursing home care." Facilities approved for long-term care beds "shall not admit residents who require a different licensing category of care, such as comprehensive rehabilitation," except in specific emergency situations. Ibid. Indeed, while the regulations state "[s]ome patients in nursing homes may, on occasion, require rehabilitative care," they also say these services "are distinguished from comprehensive rehabilitation, which may only be offered by a licensed rehabilitation hospital." N.J.A.C. 8:33H-1.1(e). Thus, the regulations suggest an entity like CareOne, licensed as a long-term care facility, may provide rehabilitation services without being considered anything other than a "nursing home" by the DOH.

In denying plaintiffs' motion for reconsideration, the court did not address the plain language of the NHA, which includes in its definition of a nursing home any facility providing medical and nursing treatment for "individuals . . .

21

who are <u>convalescing</u>,[4] or who are in need of assistance in bathing, dressing, or some other type of supervision, and are in need of such treatment or care on a continuing basis." N.J.S.A. 30:13-2(c) (emphasis added). Decedent was convalescing for an extended period—approximately two months—while being treated at CareOne and required treatment on a continuing basis. Moreover, it is undisputed CareOne was a facility providing "nursing treatment or care for two or more nonrelated individuals" under N.J.S.A. 30:13-2(c).

The NHA's definition of "nursing home" encompasses entities providing care to patients with acute conditions or who are convalescing and plan to be discharged upon sufficient improvement. That is, N.J.S.A. 30:13-2(c) does not require a facility to provide care to permanent residents to be considered a nursing home. The DOH's definition of a resident includes "every individual who resides in the long-term care facility, including, but not limited to, individuals in the facility receiving subacute care and long-term care." Letter from Michael J. Kennedy to All Licensed Long-Term Care Facilities. CareOne's argument decedent was admitted for subacute care and was not a "nursing home

---

[4] <u>See</u> <u>Merriam Webster</u>, https://www.merriam-webster.com/dictionary/convalesce (last visited July 27, 2026) (defining "convalesce" as "to recover health and strength gradually after sickness or weakness").

resident" is inconsistent with the NHA's definition of a resident and the DOH's guidance on this matter.

We therefore conclude the trial court erred in dismissing the NHA claims and in later denying plaintiffs' motion for reconsideration. Plaintiffs demonstrated CareOne satisfied the definition of a "nursing home" under N.J.S.A. 30:13-2(c), and decedent met the definition of a "resident" under N.J.S.A. 30:13-2(e). Accordingly, we reverse the court's dismissal of the NHA claims against CareOne and remand for a new trial against CareOne.

B.

Plaintiffs argue their experts should have been allowed to opine CareOne violated decedent's rights protected by the NHA, specifically the right to a safe and decent living environment. They also posit it was error to not instruct the jury pursuant to the applicable nursing home model jury charge. Plaintiffs argue precluding testimony regarding the NHA and federal nursing home statutes and not providing the applicable jury charge was error requiring reversal and retrial. They maintain Model Jury Charges (Civil), 5.77, "Violations of Nursing Home Statutes or Regulations—Negligence and Violations of Nursing Home Residents' Rights Claims" (rev. Nov. 2023), is the only jury charge specifically created for nursing home cases and the unique evidentiary issues such claims

23

present. Plaintiffs contend by not giving this jury charge, the court did not allow the jury to consider the proper bases for plaintiffs' claims.

The court noted the order dismissing the NHA claims against CareOne allowed plaintiffs to offer alleged statutory and regulatory violations to support their remaining claims. It also sustained CareOne's objections to Nurse Sheppard's testimony regarding the NHA, since the claims arising from the NHA had been dismissed. Because the NHA claims were dismissed, it appears the court also declined to charge the jury under any portion of Model Jury Charges (Civil), 5.77.

Claims of negligence and of NHA violations present different theories of liability, and both may reflect different injuries in the same case. See Ptaszynski, 440 N.J. Super. at 40. A jury may not award damages under both theories based on the same injuries or harm. Ibid.

Ordinarily, a violation of "a statutory duty of care is not conclusive on the issue of negligence, it is a circumstance which the jury should consider in assessing liability." Eaton v. Eaton, 119 N.J. 628, 642 (1990) (quoting Waterson v. Gen. Motors, 111 N.J. 238, 263 (1988)). In some instances, a "statute sets the standard of conduct to be observed." Di Giovanni v. Pessel, 104 N.J. Super. 550, 563 (App. Div. 1969), mod. on other grounds, 55 N.J. 188 (1970).

24

Similarly, regulations can "provide[] a minimum standard of safety and ha[ve] the 'force of law.'" Dubak v. Burdette Tomlin Mem'l Hosp., 233 N.J. Super. 441, 458 (App. Div. 1989) (quoting Trentacost v. Brussel, 82 N.J. 214, 230 (1980)); see also Costantino v. Ventriglia, 324 N.J. Super. 437, 443 (App. Div. 1999) (finding OSHA safety standards may be considered to establish a standard of care even if the allegedly negligent party is not subject to OSHA's regulation or enforcement).

In New Jersey, "the determination that a party has violated 'a statutory duty of care is not conclusive on the issue of negligence, it is a circumstance which the jury should consider in assessing liability.'" Labega v. Joshi, 470 N.J. Super. 472, 489-90 (App. Div. 2022) (quoting Eaton, 119 N.J. at 642). Generally, "the violation of a statute, while not negligence [p]er se, is evidence which may be considered by a jury together with all of the evidence in determining issues of negligence or contributory negligence." Id. at 491 (emphasis omitted) (quoting Mattero v. Silverman, 71 N.J. Super. 1, 9 (App. Div. 1961)). However, "this rule is subsumed by the overriding principle that the statutory violation, to be evidential, must be causally related to the happening of the accident, since a permissible inference of causality is indispensable to its relevancy." Ibid. (quoting Mattero, 71 N.J. Super. at 9).

Given our determination CareOne is subject to the NHA under the facts in this case, testimony should have been allowed to show violations of the NHA. Moreover, testimony regarding the other regulations and statutes plaintiffs claim were violated should also have been permitted as evidence in determining the standard of care for nurses and nursing homes, and an appropriate jury charge should have been given as provided under Model Jury Charges (Civil), 5.77A. The court here did not give that charge, as contemplated by the court's February 17, 2023 order, which permitted plaintiffs to "offer alleged statutory violations as evidence of negligence in support of their remaining claims." Rather, the court merely referenced various regulations and then stated, "[y]ou may consider such material as evidence of the applicable nursing standard of care." The full charge regarding statutory violations should have been given.

Because we do not know what evidence will be presented at the retrial on remand, it is not clear what portion of Model Jury Charges (Civil), 5.77 may be applicable. The charge contains instructions regarding violations of statutes or regulations as evidence of negligence, which, as noted above, was improperly not given at the first trial. Model Jury Charges (Civil), 5.77, at 2-3. The charge also contains a separate section dealing specifically with NHA violations. Id. at 3-7. We leave to the trial court's sound discretion after consideration of the

26

evidence presented at trial which portions of the charge should be given to the jury, bearing in mind CareOne's arguments regarding the purported deficiencies in the charge as it relates to NHA claims. We observe our Supreme Court "does not sanction or approve the Model Civil Jury Charges before publication by the Model Civil Jury Charge Committee, although the Supreme Court may . . . comment on the sufficiency of a charge in the context of a particular case." Flood v. Aluri-Vallabhaneni, 431 N.J. Super. 365, 383 (App. Div. 2013) (quoting Model Civil Jury Charges, General Comments, https://www.njcourts.gov/sites/default/files/generalcomments.pdf.). The Court has not yet addressed the accuracy of this charge.[5] We conclude plaintiffs are

---

[5] The Model Civil Jury Charges, General Comments further note:

> Each case turns on unique facts and trial courts and litigants must tailor the Model Civil Jury Charges to conform to the facts and circumstances of the case being tried. The Committee attempts to keep the Model Civil Jury Charges current with the state of the law. Where applicable, trial judges and litigants must tailor the Model Civil Jury Charges to reflect changes in the law since the Committee published any particular model jury charge. Accordingly, the Model Civil Jury Charge Committee reminds trial judges and litigants that the Model Civil Jury Charges are merely the starting point of the process of constructing an appropriate charge that adequately explains the law to the jury in the context of the material facts of the case being tried.

A-3244-23

entitled to a new trial as to CareOne only, on all issues, with an appropriate charge as to any NHA claims and other alleged statutory or regulatory violations that may be asserted in the retrial.

III.

Plaintiffs next argue the directed verdict dismissing the wrongful death claim was improperly granted. They maintain Dr. Krieger's testimony provided a sufficient basis for his conclusions and opinions to defeat defendants' claim he offered a net opinion regarding the wrongful death issue. They cite to portions of Dr. Krieger's de bene esse testimony in which he opined regarding decedent's cause of death. Plaintiffs posit the court erred by weighing Dr. Krieger's one answer where he could not opine on the cause of the sepsis against the balance of his prior testimony, and this presented a question of credibility for the jury to decide, not a question of admissibility.

In granting Englewood's motion to dismiss the entirety of the wrongful death claim, the court found, although Dr. Krieger was very qualified, "he had no opinion on the cause of [decedent's] sepsis." It noted Dr. Krieger did not provide an opinion on the cause of decedent's sepsis or on sepsis being the cause of death, and without that link, defendants were entitled to a directed verdict on the wrongful death claim.

Expert testimony is governed by N.J.R.E. 702, which provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The admission of expert testimony is typically committed to the "sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). A court's ruling should be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)). When reviewing a motion to dismiss, a court must "view the operative facts of the matter, to the extent they are in dispute, in the light most favorable" to the non-moving party. Aikens v. Schmidt, 329 N.J. Super. 335, 336 (App. Div. 2000).

The requirements of N.J.R.E. 702 should be "construed liberally . . . in favor of the admissibility of [the] expert testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008). To be admissible, an expert opinion must "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by

29

experts.'" Townsend, 221 N.J. at 53 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "[A]n expert's bare conclusions, unsupported by factual evidence, [are] inadmissible." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981); see also N.J.R.E. 703. These net opinions are inadmissible because "unsubstantiated expert testimony cannot provide to the factfinder the benefit that N.J.R.E. 702 envisions: a qualified specialist's reliable analysis of an issue 'beyond the ken of the average juror.'" Townsend, 221 N.J. at 55 (quoting Polzo, 196 N.J. at 582). "A party's burden of proof on an element of a claim may not be satisfied by an expert opinion that is unsupported by the factual record or by an expert's speculation that contradicts that record." Ibid.

Expert testimony is often needed when an average juror "would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony." Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001). "Nevertheless, expert testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." Ibid. Factfinders are free to accept or reject all or some of the expert's testimony and may reject an opinion even if it is unrebutted. Id. at 430-31. An expert opinion and "[t]he bases on which an expert relies when rendering an opinion are a valid subject of

30

cross-examination." Jenewicz, 193 N.J. at 466. Credibility of expert witnesses "is a jury question when people 'of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted[,] or even undisputed.'" Johnson v. Salem Corp., 97 N.J. 78, 92 (1984) (quoting Ferdinand v. Agric. Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494 (1956)).

In formulating his opinions, Dr. Krieger reviewed decedent's medical records and death certificate. In his expert report, he noted decedent's cause of death was listed as "sepsis" and opined "[t]he poor care [decedent] received at Englewood . . . and Care[]One . . . . created the clinical setting where infection occurred." Dr. Krieger considered Nurse Sheppard's opinions and conclusions, and he agreed CareOne's lack of proper care was "the proximate cause of [decedent]'s worsening . . . sacral pressure sore and related sequelae including infections." He agreed the nursing deviations Nurse Sheppard cited "allowed the ulcers to form and also allowed them to worsen" and "led to [decedent]'s increased risk for infections of other organ systems as well as systemic infection including sepsis."

During his de bene esse testimony, Dr. Krieger explained:

> [S]kin is our outer protection barrier, that is[,] our suit
> of armor is our skin. And when that is violated by

breaks or damages or open wounds, we no longer have our shield of armor, and that means that organisms that ordinarily would be blocked out by the skin[] now have access to deeper parts of our body. And when that happens, then you have what is called a local infection at the wound, and the local infection at the wound, the wound is supplied by blood, and some of those bacteria that are causing the infection invariably get in the blood, and that[,] depending on the patient's condition, can spread the infection to other parts of the body and, in fact, lead to the sepsis that we have been describing.

Dr. Krieger further explained he knew decedent's sacral wound was infected because "every wound that has necrotic tissue is infected," and the wound's tissue cultures were "positive for growth of . . . virulent organisms." He noted an infected wound also lessens the body's ability to sustain itself or fight off infections. Although he stated he did not have an opinion on the cause of the sepsis, he concluded decedent's infected wound impacted her ability to fight the sepsis, which led to her death. Specifically, when asked what role the wound and infection played in decedent's death, Dr. Krieger noted:

Well, the wound certainly seeded the blood just because it was an infected deep wound and it always does. It also diminished her capacity to fight infection or sepsis, that even if it had developed someplace else[,] such as in the kidneys or bladder, the fact that she had this open[,] uncontrolled wound . . . that compromised her overall body system[] meant that she was not able to resist sepsis, nearly as well as if . . . she did not have that wound.

This opinion was consistent with Dr. Krieger's opinions set forth in his expert report where he noted: "A large and under-treated pressure sore makes fighting this type of infection much more difficult. This was the case with [decedent]. To a reasonable degree of medical certainty[,] the improper care by [defendants] was the proximate cause" of decedent's death.

Defendants were allowed to present testimony at trial contradicting Dr. Krieger's opinion. For instance, Dr. Gilbert opined decedent's sepsis predated and contributed to the development of the sacral wound. Dr. Silver agreed decedent's sepsis led to multisystem organ failure, which led to immobility, which in turn caused the sacral wound to develop.

Dr. Krieger's opinion defendants' deviations from accepted standards of care allowed decedent's wound to develop, worsen, become infected, and compromise her ability to fight infections should have been presented to the jury. The jury, as a factfinder, could have then determined the credibility of each expert and weighed each opinion. It could have reasonably concluded, even if the wound did not cause the sepsis, the infection from the wound was a substantial factor in decedent's ability to fight the sepsis and contributed to her death. Of course, the jury could also have rejected Dr. Krieger's opinion, but his testimony should not have been excluded from its consideration.

Accordingly, we conclude the court erred in dismissing plaintiffs' wrongful death claim.

IV.

Plaintiffs next assert the trial court erred by precluding their experts from testifying about the cause of death listed on the death certificate, deeming it inadmissible hearsay. Their experts relied on the death certificate and its listed cause of death when forming their opinions. Thus, plaintiffs contend defendants' objections to the death certificate, including the listed cause of death, should have been overruled.

Plaintiffs argue the death certificate itself is admissible under N.J.R.E. 803(c)(9) as a vital statistic but concede in some circumstances, the subjective opinion of a non-testifying medical expert, such as the cause of death, may be excluded. However, they contend the court should have allowed the opinion of the non-testifying expert to be admitted because the circumstances involved in rendering the opinion tended to establish its trustworthiness. Plaintiffs assert the doctor who determined the cause of death was sepsis was directly responsible for reviewing decedent's medical history, assessing her condition, and initiating the admission process, and was an attending physician at Englewood, which renders the opinion trustworthy and reliable. They also claim

34

the court later compounded the error when it allowed defendants' expert, Dr. Gilbert, to testify regarding the cause of death listed in the death certificate.

During Nurse Sheppard's testimony, the court allowed her to identify the records she reviewed in forming her opinions. However, she was precluded from "mak[ing] a comment as to what the death certificate indicated [was] the cause of death." With respect to Dr. Krieger's testimony, the court believed he failed to causally relate the sepsis to decedent's death. Therefore, the court granted defendants' motion to preclude Dr. Krieger's testimony regarding the cause of decedent's death. Yet, when Dr. Gilbert was asked how the death certificate informed his opinion, the court overruled CareOne's relevancy objection.

A trial court's evidentiary rulings are reviewed for an abuse of discretion. Rowe v. Bell & Gossett Co., 239 N.J. 531, 551 (2019). An evidentiary ruling should be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin, 225 N.J. at 413 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rowe, 239 N.J. at 557 (citing N.J.R.E. 801(c)). Although

35

hearsay is generally inadmissible unless it falls within an exception under our Rules of Evidence, Rule 803 provides some exceptions. Public records of vital statistics, including death records, are one such exception. N.J.R.E. 803(c)(9). However, an expert opinion contained within otherwise admissible hearsay "shall be excluded if the declarant has not been produced as a witness unless the court finds that the circumstances involved in rendering the opinion tend to establish its trustworthiness." N.J.R.E. 808.

Consistent with Rule 808, although "a death certificate may constitute admissible hearsay, its contents are not conclusively probative or in any respect unrebuttable." Bainhauer v. Manoukian, 215 N.J. Super. 9, 44 (App. Div. 1987). Indeed, a death certificate "reciting a cause of death is the very sort of disputed opinion on a complex subject that should not be admitted without the opportunity to cross-examine the author." Quail v. Shop-Rite Supermarkets, Inc., 455 N.J. Super. 118, 132 (App. Div. 2018). A report may still be admitted into evidence, however, "after excising from it all matters of opinion as to the cause of death and other conclusions made by the examining doctor with regard to the place and manner of death." State v. Reddick, 53 N.J. 66, 68 (1968).

Here, decedent's death certificate states her cause of death was "sepsis" and lists the "interval between onset and death" as three weeks. The executed

death certificate does not provide any information regarding the signing physician's relation to decedent or defendants. The court asked, "how did [the signing physician], rather than the medical examiner . . . issue that death certificate?" and it asked if he had treated decedent. Plaintiffs' counsel asserted "he was an attending at Englewood." Englewood's counsel admitted the physician had privileges at the hospital and was a member of the Englewood Health Physician Network but argued he was not an agent or employee of their hospital. Although plaintiffs now claim the physician was decedent's admitting physician at Englewood, and so the statement also qualifies as a hearsay exception as a statement against party interest, there is nothing on the record to indicate this is the case.

The witnesses here were properly permitted to reference the death certificate to indicate they had reviewed it, but the cause of death opinion contained in the certificate was inadmissible as a complex and disputed medical diagnosis by a non-testifying expert. See James v. Ruiz, 440 N.J. Super. 45, 51 (App. Div. 2015). Although plaintiffs now argue the court unfairly allowed defense expert Dr. Gilbert to testify regarding the cause of death, it was plaintiffs' counsel who asked Dr. Gilbert to discuss how the death certificate informed his opinion, over defense counsels' objection. Further, Dr. Gilbert

A-3244-23

only referenced the cause of death listed on the certificate to state he disagreed with the statement and proceeded to explain why he disagreed. While the cause of death listed on the certificate was inadmissible hearsay, Dr. Gilbert's opinion the cause of death was not sepsis was proper. This reference to the certificate's listed cause of death was fleeting, and Dr. Gilbert used it to differentiate his opinion rather than for the truth of the matter. Therefore, to the extent this reference could be considered error, it was harmless. "Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Therefore, we find no error.

V.

Plaintiffs posit the court erred in striking the photograph of decedent's wound. They argue the photograph was produced during discovery and properly authenticated through Adjei-Frimung's testimony, who initially stated she had taken the photograph. Plaintiffs concede Adjei-Frimung later testified on cross-examination she was not sure she took the photo in question but argue it was error for the court to then strike it from the record and instruct the jury to disregard it. They claim the photographer need not testify for a photograph to be admissible; it is sufficient the photograph accurately reproduces what it

purports to represent. Plaintiffs argue Adjei-Frimung's testimony the photograph accurately represented decedent's wound satisfied the authentication requirement.

Initially, the court allowed plaintiffs to publish the photograph to the jury over defendants' objections. When plaintiffs' counsel subsequently asked Adjei-Frimung if the photograph depicted decedent's wound, counsel for CareOne objected, arguing the witness had not established she recalled what the wound looked like, and the court sustained the objection. After further examination revealed Adjei-Frimung was unable to definitively state she took the photograph, the court struck the photograph from the record and instructed the jury to disregard it. The court ruled the witness was unable to authenticate the photograph, confirm she had taken it, or explain how the photograph was circulated to others, if at all, and so it was not properly authenticated.

As noted, a court's evidentiary ruling is subject to review for an abuse of discretion. Rowe, 239 N.J. at 551. An appellate court "will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin, 225 N.J. at 413 (quoting Green, 160 N.J. at 492).

To properly authenticate a proffered item of evidence, "the proponent must present evidence sufficient to support a finding that the item is what its

proponent claims." N.J.R.E. 901. This rule does not require absolute certainty, only "a prima facie showing of authenticity." State v. Brown, 463 N.J. Super. 33, 51-52 (App. Div. 2020) (quoting State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999)). "Once a prima facie showing is made, the [item] is admissible, and the ultimate question of authenticity of the evidence is left to the jury." Ibid. (alteration in original) (quoting Mays, 321 N.J. Super. at 628). To properly authenticate an item, a witness must establish:

> (1) the photograph is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph.
>
> [State v. Wilson, 135 N.J. 4, 15 (1994).]

"Any person with knowledge of the facts represented in the photograph may authenticate it." State v. Joseph, 426 N.J. Super. 204, 220 (App. Div. 2012). "The person testifying need not be the photographer, because the ultimate object of an authentication is to establish its accuracy or correctness." Wilson, 135 N.J. at 14. In State v. Hockett, 443 N.J. Super. 605, 613-15 (App. Div. 2016), we found the trial court abused its discretion when it found a photograph was not properly authenticated by a witness who stated she was present when the photograph was taken.

40

Here, Adjei-Frimung testified she took photos of decedent's wound every time she changed the dressing. She recounted the photograph in question was "similar" to the photographs she took of decedent's wound, but she could not be certain if she took that particular picture. The photograph in question shows a wound but has no markers to indicate size, the date it was taken, or the location of the wound; it is captioned: "Photo taken by [decedent's] [n]urse's [a]ide."

From Adjei-Frimung's testimony, it is clear she saw decedent's wound and took several pictures of it. She also recalled decedent's wound was "quite deep." Although Adjei-Frimung could not recall if she took the particular photo she was shown at trial, Wilson does not require her to have taken the photograph. She needed only to testify the photograph accurately depicted the wound she saw. However, when plaintiffs' counsel asked this question, defense counsel objected, and she never provided an answer. The court should have allowed her to answer whether the photograph accurately depicted decedent's wound as she recalled it. It misapplied its discretion by not permitting Adjei-Frimung to answer this question and erred in finding the photograph was not properly authenticated. On remand, plaintiffs should be given an opportunity to properly authenticate the photograph.

41

## VI.

Plaintiffs next contend the court erred when it improperly admitted CareOne's exhibits into evidence at the close of its case. They claim defendants' exhibits listed as D-17 and D-18 were neither marked by defendants nor presented to witnesses at trial, and exhibits marked as D-1 to D-16 "do not appear in the record." Plaintiffs assert the unmarked exhibits were scrolled through on a screen and not shown in their entirety. They argue providing over 300 pages of CareOne's records to the jury for its deliberations bolstered CareOne's argument it provided constant care, significantly prejudicing plaintiffs' case. Plaintiffs contend any "passing references" to the exhibits were insufficient, and the medical records, due to their nature, required explanatory testimony. Thus, they assert allowing these exhibits to be entered into evidence, which were not discussed thoroughly, was error that requires retrial.

When reviewing various exhibits for admission into evidence, the court and counsel reviewed D-17, which included various documents from CareOne's medical records related to the pressure ulcer, debridement, vital signs, wound measurements, and turning and repositioning. The court allowed the entirety of D-17 to be admitted into evidence. Again, while considering D-18, the court and counsel reviewed the documents contained in the exhibit, and CareOne's

42

counsel described when the documents were used during the trial. The court noted the records in exhibit D-17 supported the elicited testimony and believed that without admitting the records "the jury might say, well, what did [CareOne's counsel do] here? He put up witnesses that said [decedent] was moved. But [counsel] didn't really show me any records." The court likewise allowed D-18 to be admitted into evidence, noting plaintiffs' counsel "had an opportunity to cross[-]examine on those specific notes of each" of the documents in the exhibit.

Excepted from the general prohibition against hearsay is:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.
>
> [N.J.R.E. 803(c)(6).]

Business records

> which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness, and therefore ought to be received in evidence unless the trial court, after examining them and hearing the manner of their preparation explained, entertains serious doubt as to whether they are dependable or worthy of confidence.
>
> [Mahoney v. Minsky, 39 N.J. 208, 218 (1963).]

A-3244-23

Medical records are typically considered admissible under this exception. Konop v. Rosen, 425 N.J. Super. 391, 403 (App. Div. 2012). However, it has been "clearly established that medical opinions in hospital records should not be admitted under the business records exception where the opponent will be deprived of an opportunity to cross-examine the declarant on a critical issue such as the basis for the diagnosis or cause of the condition in question." Nowacki v. Cmty. Med. Ctr., 279 N.J. Super. 276, 282-83 (App. Div. 1995). Further, "it is 'the degree of complexity of the procedures utilized in formulating the conclusions expressed in the [expert's] report' which determines whether it is too complex to be admitted under the business records exception." Id. at 283 (alteration in original) (quoting State v. Matulewicz, 101 N.J. 27, 30 (1985)). When a record contains only "a straightforward observation of a treating physician," it may be properly admitted. Blanks v. Murphy, 268 N.J. Super. 152, 164 (App. Div. 1993).

Because we are remanding for a new trial as to CareOne, we need not determine if the court erred because we do not know if CareOne will attempt to move the same documents into evidence at the retrial. That said, the parties shall comply with the court rules, the rules of evidence, and the above caselaw if they intend to enter any records into evidence. We further observe it does not

appear plaintiffs asserted before the trial court the records contained any complex or highly technical records, as they now suggest. To the extent plaintiffs believe there are such inadmissible documents in the subject records, they shall properly advance that objection before the trial court on remand.

## VII.

Plaintiffs further assert the court erred in granting defendants' request to provide a Scafidi[6] charge. They note CareOne alleged decedent's wounds were caused by her pre-existing conditions but maintain the Scafidi charge is only applicable when the pre-existing condition itself caused the ultimate harm or loss. Plaintiffs argue pressure ulcers are caused by the failure to relieve pressure, not pre-existing conditions by themselves. They also contend the court did not properly utilize the Scafidi charge since it failed to list the pre-existing conditions as indicated by the relevant model jury charge.

The trial court found Scafidi was "controlling precedent . . . and a guiding case as to what the ultimate charge and verdict sheet w[ould] be." It instructed the jury to consider "whether . . . plaintiff[s] ha[d] proven that the increased risk of harm was a substantial factor in producing the ultimate harm or injury." The charge sheet also included a section on pre-existing conditions, instructing the

---

[6] Scafidi v. Seiler, 119 N.J. 93 (1990).

jury if it found defendants deviated from the accepted standard of care, it should consider if the deviation increased the risk of harm and whether that risk of harm was a substantial factor in producing the injury. The charge noted the "deviation need not be the only cause, or even a primary cause, of an injury . . . to be a substantial factor" and for defendants to be liable. The jury was instructed if it found decedent "would have suffered the same injuries even if . . . defendants' nursing staffs did not deviate from accepted standards of nursing care, then . . . defendants are not liable."

We review a trial court's instruction on the law de novo. Palmer v. Flagship Resort Dev. Corp., 481 N.J. Super. 465, 482 (App. Div. 2025). "A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002) (quoting Rendine v. Pantzer, 276 N.J. Super. 398, 431 (App. Div. 1994)). "When a party objects to the jury charge at trial, the 'reviewing court should reverse on the basis of that challenged error unless the error is harmless.'" Est. of Kotsovska by Kotsovska v. Liebman, 221 N.J. 568, 592 (2015) (quoting Toto v. Ensuar, 196 N.J. 134, 144 (2008)). An error is considered harmful if it is "clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2). The court should review the jury

A-3244-23

charge as a whole, rather than focusing solely on the alleged error. Ibid. When instructing a jury in more complex cases, "the better practice . . . is to discuss the law in the context of the material facts of the case, reviewing the evidence, where appropriate." Reynolds v. Gonzalez, 172 N.J. 266, 290-91 (2002) (quoting Bitsko v. Main Pharmacy, Inc., 289 N.J. Super. 267, 284 (App. Div. 1996)). While "the abstractness of the trial court's instruction" alone is "not an independent source of reversible error," it may be reversible error if a jury could be confused on "how to apply the legal principles that were to guide its decision to the factual contentions of the parties." Id. at 291.

To establish a claim of medical malpractice, "a plaintiff must present expert testimony establishing[:] (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (quoting Gardner v. Pawliw, 150 N.J. 359, 375 (1997)). The burden of proof on all elements of an ordinary or medical negligence claim—which includes that the defendant's conduct proximately caused the plaintiff's injury—is normally on the plaintiff. See Komlodi v. Picciano, 217 N.J. 387, 409 (2014).

In a medical malpractice action, generally, "the causation element . . . is the most complex." Verdicchio v. Ricca, 179 N.J. 1, 23 (2004). Our Supreme

Court has noted, "[w]hen a patient is treated for a pre[-]existing condition and a physician's negligence worsens that condition, it may be difficult to identify and prove the precise injury caused by the physician." Komlodi, 217 N.J. at 414. The Court created a two-pronged test to address such a scenario: "a jury must decide whether any 'negligent treatment increased the risk of harm posed by a pre[-]existent condition' and, if so, 'whether the increased risk was a substantial factor in producing the ultimate result.'" Ibid. (quoting Scafidi, 119 N.J. at 108).

"In the typical Scafidi case, the plaintiff seeks treatment for a pre[-]existing condition, and the physician, through negligence, either fails to diagnose or improperly treats the condition, causing it to worsen and sometimes causing the plaintiff to lose the opportunity to make a recovery." Id. at 415. Generally, when "a plaintiff's ultimate harm may have occurred solely by virtue of a pre[-]existent condition, without regard to a tortfeasor's intervening negligence, the defendant's liability for damages should be adjusted to reflect the likelihood of that outcome." Scafidi, 119 N.J. at 112-13. A jury should be instructed "to determine the likelihood, on a percentage basis, that the [harm] would have occurred even if [the] defendant's treatment was faultless," and if the jury returns a verdict against the defendant, the court should "mold the verdict to limit [the] defendant's liability to the value of the lost chance for

48

recovery attributable to [the] defendant's negligence." Id. at 114.

A necessary prerequisite for a trial court to issue a Scafidi charge is a finding the plaintiff suffered from a pre-existing condition. If a dispute over the existence and identity of a pre-existent condition arises in a Scafidi-type case, the party seeking the Scafidi charge "bear[s] the burden of establishing the existence and identity of such a condition." See Anderson v. Picciotti, 144 N.J. 195, 211 (1996). "[I]n instructing the jury, the trial court is expected to review facts relevant to the charge and to identify the pre[-]existing disease or condition." Komlodi, 217 N.J. at 417.

Our Supreme Court noted:

> Where the malpractice involves treatment of a pre[-]existing disease, the assessment of damages poses a problem because of the practical difficulty in separating that part of the harm caused by the malpractice from the pre[-]existing disease and its normal consequences. Because of this, courts are now taking the view that in a situation where the malpractice or other tortious act aggravates a pre[-]existing disease or condition, the innocent plaintiff should not be required to establish what expenses, pain, suffering, disability[,] or impairment are attributable solely to the malpractice or tortious act, but that the burden of proof should be shifted to the culpable defendant who should be held responsible for all damages unless [they] can demonstrate that the damages for which [they are] responsible are capable of some reasonable apportionment and what those damages are.

A-3244-23

Consistent with Scafidi, an applicable model jury charge should be used "only in cases where it is alleged that the plaintiff has a pre-existing condition which, by itself, had a risk of causing the plaintiff the harm the plaintiff ultimately experienced in this case." Model Jury Charges (Civil), 5.50E, "Pre-Existing Condition—Increased Risk/Loss of Chance—Proximate Cause," at 1 (rev. Mar. 2021).

Here, defendants presented expert witnesses who testified decedent had multiple pre-existing conditions and comorbidities when she was admitted to Englewood. Harold Brem, M.D., noted decedent had a history of vascular disease, problems with her foot, and diabetes, and that when she was admitted on December 11, 2017, she was "in dire straits because she . . . had bacteria in her blood." Dr. Gilbert testified decedent's pressure wound "would have occurred regardless" and "was going to evolve no matter what was done for it." Dr. Silver opined decedent's wound's progression was "unavoidable." Dr. Barnes likewise testified decedent's wound was "unavoidable." She also opined certain comorbidities, including diabetes, hypertension, hyperlipidemia, and anemia, impacted decedent's ability to heal her wound. Dr. Barnes admitted on cross-examination a wound would only be "unavoidable" if a facility, knowing

about a patient's pre-existing conditions and comorbidities, evaluated the patient's risk factors, implemented appropriate interventions, and monitored the impact of the care, but the wound developed regardless. Plaintiffs' expert, Nurse Sheppard, also acknowledged decedent's comorbidities and agreed "a wound is . . . unavoidable only if the patient develops it in the face of all standard[s] of care being met by nursing."

We conclude the trial court did not err in providing a Scafidi charge. In Ptaszynski, we noted when there is sufficient evidence in a case "to show within a reasonable degree of medical probability that the alleged negligent treatment may have increased the risk of harm posed by an individual's pre-existing injury, the jury must be instructed to consider whether the increased risk was a substantial factor in producing the ultimate result." 440 N.J. Super. at 39-40; see also Model Jury Charge (Civil), 5.50E. Given defendants' experts' testimony here, there was an ample basis in the record to give the charge.

However, we agree the court should have specifically set forth the pre-existing conditions defendants alleged so as to tailor the charge to the specific facts in this case. "[I]n instructing the jury, the trial court is expected to review facts relevant to the charge and to identify the pre[-]existing disease or condition." Komlodi, 217 N.J. at 417. On remand, the court shall amend the

51

charge to conform with the evidence regarding decedent's pre-existing conditions presented at the retrial.

For the reasons noted above, we remand for a new trial on all issues regarding the claims against CareOne.  We affirm the dismissal as to Englewood because the arguments plaintiffs advanced in this appeal involve proximate cause or damage issues, and our bases for reversing regarding CareOne do not implicate Englewood.  The jury determined Englewood did not deviate from accepted standards of care, and therefore, it is irrelevant whether the wrongful death claim was improperly dismissed or the Scafidi charge was improper, which we have, in any event, concluded was correct.  Accordingly, there is no basis for plaintiffs to proceed against Englewood.

To the extent we have not specifically addressed any remaining arguments the parties raised, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-3244-23